**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| MICHAEL GROVER COE<br>1046 Spanish Oak Dr.<br>Kerrville, TX 78028<br><br>JOSEPH PAUL ENGLEHARDT,<br>315 North Highland Street<br>Arlington, VA 22201<br><br>ANDREA LYNN TWINE<br>7407 Roger Street<br>Machesney Park, IL 61115<br><br>YVONNE DORA WADE<br>7014 Canyon Drive<br>Capitol Heights, MD 20743<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT<br>OF JUSTICE<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001,<br><br>MERRICK B. GARLAND, *in his official*<br>*Capacity as Attorney General of the United*<br>*States of America*<br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530-0001,<br><br>UNITED STATES DEPARTMENT<br>OF TREASURY<br>Treasury Annex / Freedman's Bank Building<br>1500 Pennsylvania Avenue, NW<br>Washington, DC 20220<br><br>FINANCIAL CRIMES ENFORCEMENT<br>NETWORK<br>2070 Chain Bridge Road, Suite 200<br>Vienna, VA 22182 | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Case No. 24-cv-2714<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

OFFICE OF FOREIGN ASSETS CONTROL   )
Treasury Annex / Freedman's Bank Building   )
1500 Pennsylvania Avenue, NW   )
Washington, DC 20220   )
    )
COMMODITY FUTURES TRADING   )
COMMISSION   )
1155 21st Street, NW   )
Washington, DC 20581   )
    )
                  Defendants.   )
_____   )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### NATURE OF THE ACTION

1.　　Plaintiffs Michael Grover Coe, Joseph Paul Englehardt, Andrea Lynn Twine, and Yvonne Dora Wade bring this action against the United States Department of Justice, Attorney General Merrick Garland (collectively, "DOJ"), the United States Department of Treasury, the Financial Crimes Enforcement Network, the Office of Foreign Assets Control, and the Commodity Futures Trading Commission (collectively, "Defendants") under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. § 2201. Plaintiffs seek an order under 5 U.S.C. § 706(1) that Defendants have unlawfully withheld directing proceeds paid to the United States pursuant or related to the judgment entered in the case docketed as *USA v. Binance Holdings Ltd.*, 2:23-cr-00178-RAJ (W.D. Wash. 2023) ("*Binance*")—an amount that exceeds $4.3 billion—into the United States Victims of State Sponsored Terrorism Fund (the "Victims Fund"), as they are required to do by law. Plaintiffs also seek a declaration that proceeds paid to the United States, or to be paid to the United States, pursuant or related to *Binance* are required to be deposited into the Victims Fund, as explained below.

2.　　Plaintiffs are victims, or family members of victims, of state-sponsored terrorism who were killed or grievously injured abroad serving our country in military and civil service.

Terrorist states have been targeting, injuring, and killing Americans for decades, ramping up significantly in the 1980s and 1990s with attacks on U.S. Embassies abroad. Terrorist states continue to injure or kill Americans through the present day.

3.      Like thousands of other victims, Plaintiffs spent decades pursuing justice and redress for the terrorist attacks that caused them so much harm, with little or no success. In 1996, however, Congress amended the Foreign Sovereign Immunities Act ("FSIA") specifically to allow U.S. victims of state-sponsored terrorism to seek justice against terrorist states by suing in U.S. courts.

4.      The terrorism exception to the FSIA, codified at 28 U.S.C. § 1605A, waives sovereign immunity for certain terrorist acts of any foreign state designated as a "State Sponsor of Terrorism" either at the time an attack sponsored by that foreign state occurred or as a result of the attack that is the subject of the litigation.

5.      Designation as a State Sponsor of Terrorism is applied to a foreign state whose government has repeatedly provided support for acts of international terrorism, as determined by the United States Department of State pursuant to section 1754(c) of the National Defense Authorization Act for Fiscal Year 2019, section 40 of the Arms Export Control Act, and section 620A of the Foreign Assistance Act.

6.      Cuba, Iran, North Korea, and Syria are the only states currently designated as State Sponsors of Terrorism. Iraq, Libya, South Yemen, and Sudan were previously designated, but have had their designations rescinded.

7.      Unfortunately, while the terrorism exception allowed victims of state-sponsored terrorism to obtain judgments, it did not provide any means for plaintiffs to collect on their judgments. Thus, between 1996 and 2015, U.S. courts awarded billions of dollars in judgments

against State Sponsors of Terrorism, but victims could not collect on those judgments because the defendants did not pay them and had few attachable assets in the U.S.

8.      In 2015, recognizing the needs of injured victims and the family members of injured and deceased victims, and the attendant difficulty with collecting judgments, Congress enacted the United States Victims of State Sponsored Terrorism Act, 34 U.S.C. § 20144 (the "Victims Act"), which, as amended, established the Victims Fund, to be administered by a special master appointed by the Attorney General of the United States.

9.      The Victims Act charges the special master with administering the Victims Fund, and requires DOJ to direct the proceeds of qualifying cases to be deposited into the Victims Fund.

10.     The Victims Act also requires a special master to distribute funds held in the Victims Fund to eligible victims. Since its inception, the Victims Fund has made only four distributions in nine years, despite the fact that the original intent was for annual meaningful distributions. Distribution amounts are determined on a *pro rata* basis. This means that in each distribution, all eligible victims receive an amount calculated based on the same percentage of their respective judgments. The first distribution, in 2017, provided victims with 13.66% of their judgments. The most recent distribution, in 2023,  provided victims no more than 0.4% of their judgments. In five of the past nine years, no distribution has been made at all. Currently, no victim has received even a quarter of his or her total judgment amount from the Victims Fund, and thousands have received nothing.

11.     The Victims Fund is capitalized primarily from proceeds obtained by the United States—either through judgments or settlements—in criminal and civil matters "arising from" (1)

a violation of the International Emergency Economic Powers Act ("IEEPA");[1] or (2) a violation

of the Trading with the Enemy Act ("TWEA");[2] or (3) any related criminal conspiracy; or (4) any

related scheme; or (5) any other related federal offense arising from "doing business with or acting

on behalf of, a state sponsor of terrorism." 34 U.S.C. §20144(e)(2)(A)(i)&(ii).

12.     For the vast majority of victims, distributions from the Victims Fund are the only

source of justice and recompense for their crippling and permanent terrorism-related injuries and

losses.

13.     On an *ad hoc* basis, Congress has also appropriated other sources of funding for the

Victims Fund, but typically directed those distributions to limited groups of victims.

14.     But for the Victims Act directing certain proceeds into the Victims Fund, those

proceeds would otherwise be available for DOJ to use for its own purposes.

15.     Plaintiffs are eligible claimants to the Victims Fund and therefore entitled to receive

payments when the Victims Fund makes distributions.

16.     Relevant here, between July 8, 2024 and July 16, 2024, amounts totaling

$1,505,475,575 were paid by or on behalf of Binance Holdings Limited ("Binance"), a defendant

in *Binance*, to the United States District Court for the Western District of Washington, the court

---

[1] 50 U.S.C. § 1701 et seq. IEEPA authorizes the President to impose economic sanctions in response to an unusual or extraordinary threat, which has its source in whole or substantial part outside the U.S., to the national security, foreign policy, or economy of the U.S. when the President declares a national emergency with respect to that threat. Using the powers conferred by IEEPA, the Executive Branch issues orders and regulations governing and prohibiting certain transactions with countries, individuals, and entities. Distinct from the ability to designate a country a State Sponsor of Terrorism, IEEPA serves as an important tool to help protect our nation from terrorism. For instance, there are currently active IEEPA emergencies involving Iran, Syria, and North Korea—each of which is also designated a State Sponsor of Terrorism.

[2] 50 U.S.C. App. 1. TWEA gives the President the power to oversee and restrict trade with designated foreign nations during times of war. 50 U.S.C. § 4301 et seq. While many of the current and former designated state sponsors of terrorism have been designated pursuant to TWEA, Cuba is currently the only state still subject to sanctions under TWEA.

presiding over the *Binance* case. Those proceeds qualify for deposit, and therefore were required to be deposited, into the Victims Fund pursuant to the Victims Act.

17.     For the same conduct alleged in the criminal case, Binance also has paid and will pay penalties, fines, and forfeitures to the United States to settle certain civil liabilities, as enforced by various agencies of the United States. Those civil penalty proceeds also qualify for deposit, and therefore were required to be deposited, into the Victims Fund pursuant to the Victims Act.

18.     All told, the *Binance* defendants agreed to pay over $4.3 billion to the United States (the "*Binance* Proceeds"). Under the Victims Act, Defendants are required to deposit 100% of the criminal proceeds, and 75% of the civil proceeds, that comprise that $4.3 billion, into the Victims Fund.

19.     Despite this clear legal requirement, DOJ has asserted—including in a letter dated May 3, 2024 to U.S. Senator Charles Grassley—that it intends to direct at least $1,505,475,575 that Binance paid directly to the Western District of Washington, in the criminal case, away from the Victims Fund and into a different fund. This is unlawful under the Victims Act.

20.     There is no discretion here. The directive of the Victims Act is clear: if a case meets the statutory requirements, all criminal proceeds "forfeited or paid to the United States" from that case, and 75% of any civil penalty proceeds, ***shall*** be deposited into the Victims Fund.

21.     Given the payment by *Binance* defendants of more than $1.5 billion between July 8, 2024 and July 16, 2024, and DOJ's letter to Senator Grassley explaining how those proceeds will be directed away from the Victims Fund, and given also Plaintiffs' direct interest in the disposal of the *Binance* Proceeds by virtue of being eligible claimants to Victims Fund funds, an actual controversy exists for which Plaintiffs seek a declaration of their rights. Indeed, that declaration will be critical not only for the two named Plaintiffs in this case, but also the nearly

20,000 other victims of state-sponsored terrorism who are entitled to share in those same amounts through their *pro rata* distributions from the Victims Fund.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over this civil action under 28 U.S.C. § 1331 because the action arises under federal law, namely the APA, 5 U.S.C. §§ 701-706, and the Declaratory Judgment Act, 28 U.S.C. § 2201.

23.     The United States has waived sovereign immunity to be sued in this lawsuit under 5 U.S.C. § 702.

24.     Venue is proper in this judicial district under 28 U.S.C. § 1391(e) because one or more Defendants resides in this judicial district and the actions that are the subject of this Complaint were taken, at least in material part, in this district.

25.     Plaintiffs have no other remedy to exercise their rights with respect to the *Binance* Proceeds.

26.     Plaintiffs have standing because, as eligible claimants to Victims Fund funds under the Victims Act, the manner by which *Binance* Proceeds are disposed directly affects their interests and welfare.

## PARTIES

27.     Plaintiff Michael Grover Coe is a resident of Texas. Mr. Coe is an eligible victim with rights to proceeds required by law to be deposited into the Victims Fund. He has not received any distributions from the Victims Fund.

28.     Plaintiff Joseph Paul Englehardt is a resident of Virginia. Mr. Englehardt is an eligible victim with rights to proceeds required by law to be deposited into the Victims Fund. He has received payments from one prior distribution of the Victims Fund, totaling less than one percent of his compensatory damages judgment (0.4%).

7

29.     Plaintiff Andrea Lynn Twine is a resident of Illinois. Ms. Twine is an eligible victim with rights to proceeds required by law to be deposited into the Victims Fund. She has not received any distributions from the Victims Fund.

30.     Plaintiff Yvonne Dora Wade is a resident of Maryland. Ms. Wade is an eligible victim with rights to proceeds required by law to be deposited into the Victims Fund. She has received payments from one prior distribution of the Victims Fund, totaling less than one percent of her compensatory damages judgment (0.4%).

31.     Defendant United States Department of Justice is a Department of the United States Government. Its headquarters are located in Washington, D.C.

32.     Defendant Merrick Garland is the Attorney General of the United States and, in that capacity, is the top officer and decision-maker at the Department of Justice. He is sued here in his official capacity.

33.     Defendant United States Department of Treasury is a Department of the United States Government. Its headquarters are located in Washington, D.C.

34.     Defendant Financial Crimes Enforcement Network is a bureau within the U.S. Department of the Treasury responsible for regulating U.S. financial institutions. Its principal office is located in Vienna, Virginia.

35.     Defendant Office of Foreign Assets Control is a component of the U.S. Department of the Treasury which administers and enforces economic and trade sanctions. Its headquarters are located in Washington, D.C.

36.     Defendant Commodity Futures Trading Commission is an independent federal agency that regulates the derivatives markets, including futures contracts, options, and swaps, in the United States. Its headquarters are located in Washington, D.C.

## GENERAL ALLEGATIONS

### I.    Relief for Victims of Terrorism

37.    Plaintiff Michael Grover Coe was serving as a lieutenant colonel in the U.S. Marine Corps when he was injured in the 1983 bombing of the U.S. Embassy in Beirut, Lebanon. The blast threw Mr. Coe from his chair, smashing him into the wall. Mr. Coe suffered a concussion, as well as shrapnel injuries and hearing damage. As he tried to escape the building, the stairwells of which had collapsed in the blast, Mr. Coe helped victims around him who had suffered horrifying and grievous injuries, until he was able to jump from a third-story window onto the roof of the parking garage before climbing down to the street and getting assistance for himself. Mr. Coe suffers to this day from the hearing damage. He also continues to suffer from flashbacks, especially to images of the wounded victims he helped, anxiety and depression. In 2024, Mr. Coe received a judgment against Iran, a designated State Sponsor of Terrorism, for monetary damages for the role that Iran played in orchestrating, funding, and directing the bombing of the embassy through its agents and co-conspirators who were affiliated with the Hezbollah terrorist organization. *See e.g.,* Judgment, *Maxwell v. Islamic Republic of Iran*, No. 1:22-cv-00173-RC (D.D.C. Mar. 29, 2024), ECF. No. 38.

38.    Plaintiff Joseph Paul Englehardt was serving in the U.S. armed forces when he was injured in the 1983 bombing of the U.S. Embassy in Beirut, Lebanon. As a result of the bombing, Mr. Englehardt was struck by shrapnel and glass fragments—many of those fragments could not be surgically removed and over the years moved through his skin, a constant painful reminder of his traumatic experience. Mr. Englehardt suffers to this day from flashbacks, sleep disorders, anxiety, and other emotional injuries, in addition to his physical injuries. In 2022, Mr. Englehardt received a judgment against Iran, a designated State Sponsor of Terrorism, for monetary damages for the role that Iran played in orchestrating, funding, and directing the bombing of the embassy

through its agents and co-conspirators who were affiliated with the Hezbollah terrorist organization. *See, e.g.,* Judgment, *Jones v. Islamic Republic of Iran*, No. 1:20-cv-00850-RC (D.D.C. June 16, 2022), ECF No. 44.

39.     Plaintiff Andrea Lynn Twine's father, Richard Twine, was serving in the U.S. Army when he was killed in the 1983 bombing of the U.S. Embassy in Beirut, Lebanon. Ms. Twine was only 14 when her father was killed. When she opened the door that morning to a police officer and an Army official, she knew immediately what it meant. Losing her father at such a young age left Ms. Twine feeling depressed and withdrawn, and severely impacted her personal relationships. She has continued to struggle with bouts of intense sadness and withdrawal ever since her father's murder. In 2024, Ms. Twine received a judgment against Iran, a designated State Sponsor of Terrorism, for monetary damages for the role that Iran played in orchestrating, funding, and directing the bombing of the embassy through its agents and co-conspirators who were affiliated with the Hezbollah terrorist organization. *See e.g.,* Judgment, *Maxwell v. Islamic Republic of Iran*, No. 1:22-cv-00173-RC (D.D.C. Mar. 29, 2024), ECF. No. 38.

40.     Plaintiff Yvonne Dora Wade was employed by the U.S. Embassy when she was injured in the 1984 bombing of the U.S. Embassy Annex in Beirut, Lebanon. Ms. Wade suffered from multiple lacerations to her face, loss of vision in her right eye, severe lacerations on her arm and hand, a severed tendon in her finger, and a ruptured ear drum. She was unable to work for a year following the attack and she still suffers from the loss of a significant portion of her vision, loss of hearing, and the tolls of her other physical and emotional injuries. In 2022, Ms. Wade received a judgment against Iran, a designated State Sponsor of Terrorism, for monetary damages for the role that Iran played in supporting the bombing of the embassy annex. *See e.g.,* Judgment, *Jones v. Islamic Republic of Iran*, No. 1:20-cv-00850-RC (D.D.C. June 16, 2022), ECF No. 44.

41.     As then Chief Judge Royce Lamberth wrote more than a decade ago regarding plaintiffs who have pursued justice against Iran: "Despite the best intentions of Congress and moral statements of support from the Executive Branch, the stark reality is that the plaintiffs in these actions face continuous road blocks and setbacks in what has been an increasingly futile exercise to hold Iran accountable for unspeakable acts of terrorist violence." *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 35-36 (D.D.C. 2009).

42.     In 2015, recognizing the needs of injured victims and the family members of injured and deceased victims, and the difficulty with collecting judgments, Congress enacted the Justice for United States Victims of State Sponsored Terrorism Act, 34 U.S.C. § 20144 (the "Victims Act"), which established the Victims Fund, to be administered by a special master appointed by the Attorney General. *See* Pub. L. No. 114-113, § 404, 129 Stat. 2242, 3007 (2015). Congress has amended the Victims Act three times—in 2019, 2020, and 2022. *See* United States Victims of State Sponsored Terrorism Fund Clarification Act, Pub. L. No. 116-69, § 1701, 133 Stat. 1134, 1140–43 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 1705 (2020); Fairness for 9/11 Families Act, Pub. L. 116–69, §1701(c), 133 Stat. 1143 (2022). None of those amendments changed the categories of cases whose proceeds are required to be deposited into the Victims Fund. At all times—and still today—the Victims Act plainly requires that proceeds from cases involving violations of specific statutes, or State Sponsors of Terrorism, *shall* be deposited into the Victims Fund to help ease the suffering of the victims of such terrorism.

43.     Eligibility for compensation from the Victims Fund is also straightforward: A claimant must hold an unsatisfied final judgment issued by a U.S. federal district court against a designated State Sponsor of Terrorism in a case where sovereign immunity was removed based on the terrorism exception to the Foreign Sovereign Immunity Act (FSIA), codified at 28 U.S.C. §

1605A. 34 U.S.C. § 20144(c). Certain claims for victims who were held hostage at the United

States Embassy in Iran between 1979 and 1981, are also eligible. *See* 34 U.S.C. § 20144(c)(2).

According to the U.S. Victims of State Sponsored Terrorism website, there are more than 18,000

such eligible claimants registered with the Victims Fund. *See Distributions and Payments*, U.S.

Victims of State Sponsored Terrorism Fund, https://usvsst.com/Home/Payments (last visited Sept.

23, 2024). And this number grows each year as state-sponsored terrorism tragically proliferates,

for example, with the recent heinous October 7 attack in Israel, the American victims of which

would be eligible victims in the Victims Fund upon obtaining judgments.

44.     The Victims Act requires the proceeds of qualifying cases to be deposited into the

Victims Fund, *see* 34 U.S.C. § 20144(b)(1)(A)(iii); 34 U.S.C. § 20144(e)(2), and requires the

special master to distribute those proceeds, *pro rata*, to eligible victims—meaning that in each

distribution, all eligible victims receive the same percentage of their respective judgments from

their portion of the Victims Fund (subject to certain caps). 34 U.S.C. § 20144(d). The Act does not

confer discretion on DOJ or the special master to choose which amounts to direct into the Victims

Fund. The plain language reflects the statute's purpose that the deposits from qualifying cases

would allow the Victims Fund to make timely, consistent, and meaningful distributions, but it has

made only four distributions in the nine years since it was established, in severely diminishing

amounts. *See* U.S. Gov't Accountability Off., GAO-24-106863, U.S. Victims of State Sponsored

Terrorism Fund (2024), at 1. This is largely the result of DOJ's actions (or inactions), such as those

it has taken (or failed to take) here.

45.     The Victims Fund is funded by funds received by the United States through

judgments or settlements in criminal and civil matters "arising from" five categories of cases: (1)

a violation of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et

seq.; or (2) a violation of the Trading with the Enemy Act ("TWEA"), 50 U.S.C. App. 1; or (3) any related criminal conspiracy; (4) any related scheme; or (5) any related other federal offense arising from "doing business with or acting on behalf of, a state sponsor of terrorism." 34 U.S.C. §20144(e)(2)(A)(i)&(ii). In this way, Congress made clear that American victims of state-sponsored terrorism would not be limited by the vagaries of plea agreements or other resolutions negotiated with bad actors without the victims' input or involvement, but would receive the proceeds of all cases involving designated statutes, or State Sponsors of Terrorism, period. And it is this clear because those are the only limited types of cases on which these victims depend. The Act requires:

**(2) Deposit and transfer**
Beginning on December 18, 2015, the following ***shall be*** deposited or transferred into the Fund for distribution under this section:

**(A) Forfeited funds and property**

**(i) Criminal funds and property**

***All*** funds, and the net proceeds from the sale of property, forfeited or paid to the United States after December 18, 2015, as a criminal penalty or fine arising from a violation of any license, order, regulation, or prohibition issued under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the Trading with the Enemy Act (50 U.S.C. App. 1 et seq.), or any related criminal conspiracy, scheme, or other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

**(ii) Civil funds and property**

Seventy-five percent of all funds, and seventy-five percent of the net proceeds from the sale of property, forfeited or paid to the United States after December 18, 2015, as a civil penalty or fine arising from a violation of any license, order, regulation, or prohibition issued under the International Emergency Economic Powers Act (50 U.S.C. 1701 et seq.) or the Trading with the Enemy Act (50 U.S.C. App. 1 et seq.),1 or any related conspiracy, scheme, or other Federal offense arising from the

actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

34 U.S.C. § 20144(e) (emphasis added). As noted, there is no discretion in the statute. DOJ "shall" direct the deposit of these funds into the Victims Fund. *Id.*

## II.     The Binance Plea Agreement

46.     Binance is in the business of cryptocurrency. It was founded in 2017 by Changpeng Zhao, its majority owner and chief executive officer.

47.     In July 2017, Binance launched Binance.com—a virtual currency exchange.

48.     Binance's virtual currency exchange allows users to buy and sell virtual assets. Users can store their virtual assets, including cryptocurrency, in accounts maintained by Binance. When a user opens an account, Binance assigns it a custodial virtual currency wallet, *i.e.*, a wallet in Binance's custody that allows the user to conduct transactions on the platform, including transferring funds to other Binance users or accounts or to external virtual currency wallets.

49.     As a foreign-located cryptocurrency exchange doing business in the U.S., Binance qualifies as a money services business, or "MSB." These kinds of financial entities are required to comply with a variety of U.S. laws, including laws designed to protect against conducting business in sanctioned jurisdictions, or with blocked persons, including business with or within countries designated as State Sponsors of Terrorism.  To that end, one of those laws, the Bank Secrecy Act, and its implementing regulations, also requires an MSB to implement and maintain an effective anti-money laundering ("AML") program that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities.

50.     In the *Binance* case, DOJ charged Binance with violating these laws, including the International Emergency Economic Powers Act ("IEEPA"), and related violations of other federal laws, including the Bank Secrecy Act, by processing billions of dollars' worth of cryptocurrency

transactions in utter disregard for that regulatory scheme. In doing so, Binance willfully caused violations of U.S. economic sanctions issued pursuant to IEEPA, in a deliberate and calculated scheme to profit from the U.S. market while flouting the applicable (and essential) legal requirements, and failing to implement the controls required by U.S. law to, *inter alia*, prevent financing terrorist activity in countries the U.S. has designated as State Sponsors of Terrorism.

51.     In short, between no later than August 2017 and continuing until October 2022, Binance and several co-conspirators, including its owner and CEO Zhao, executed a coordinated scheme to operate Binance.com as an unlicensed money transmitting business, or MTB, in order to gain market share and profit as quickly as possible. In order to achieve this goal, Binance.com attracted U.S. users but chose not to comply with U.S. legal and regulatory requirements because it determined that doing so would limit its ability to maintain and attract those users because of the legal restrictions and prohibitions like those described above.

52.     As set forth in the case, Binance knew that U.S. law prohibited U.S. persons from conducting financial transactions with countries, groups, entities, or persons sanctioned by the U.S. government—including designated State Sponsors of Terrorism, and those residing in those terror-sponsoring countries.  Yet, to reap billions in profits, Binance intentionally operated its business in a manner that facilitated the execution of trades between U.S. persons and sanctioned counterparties in clear contravention of U.S. law, not to mention dangerously opening the door to terrorist financing.  And worse, Binance not only failed to implement necessary controls and protective measures, but it intentionally concealed its wrongdoing to avoid detection and keep the funds flowing, thereby growing its business.

53.     As a result of its scheme, Binance caused over one million transactions, with an aggregate transaction value of hundreds of millions of dollars, to occur in violation of IEEPA. The

majority of these transactions involved users residing in Iran, but Binance also caused massive numbers of transactions between U.S. users and users in other sanctioned jurisdictions, including Cuba, Syria, and elsewhere.

54.     Cuba, Iran, and Syria are each currently designated State Sponsors of Terrorism and were so designated during the criminal activity in *Binance*.

55.     These prohibited transactions involved transactions with individuals subject to sanctions in Iran, affiliates of the Iranian Revolutionary Guard Corps, and with known terrorist groups and proxies of State Sponsors of Terrorism, such as Al Qaeda, Hamas' Al-Qassam Brigades, Hezbollah, the Islamic State of Iraq and Syria (ISIS), and Palestinian Islamic Jihad.

56.     From each transaction in violation of U.S. law, Binance profited from the fees it charged and was also able to advance its overall business scheme by providing liquidity and creating markets for its virtual currency exchange that comprised its business model.

57.     On November 14, 2023, the Department of Justice charged Binance in a three-count Information with violating IEEPA as part of its conspiracy and scheme, in addition to other related federal offenses, including offenses relating to State Sponsors of Terrorism. *See e.g.,* Information, *USA v. Binance Holdings Ltd.*, No. 2:23-cr-00178-RAJ (W.D. Wash. Nov. 11, 2023), ECF No. 1 (the "Information"). The Information sought the forfeiture of any real or personal property which constituted or was derived from the proceeds traceable to the conspiracy and underlying offenses.

58.     On November 21, 2023, Binance pled guilty to all three Counts in the single case. *See* Plea Agreement, *USA v. Binance Holdings Ltd.*, No. 2:23-cr-00178-RAJ (W.D. Wash. Nov. 21, 2023), ECF No. 23 (the "Plea Agreement"). As part of the Plea Agreement, Binance agreed to a fine of $1,805,475,575 ("Criminal Fine") and a forfeiture in the amount of $2,510,650,588 ("Total Money Judgment"). *Id.* at 13-14. The forfeiture amount was comprised of a money

16

judgment in the amount of $898,618,825 (which DOJ called the "IEEPA Money Judgment," representing the amount of transactions Binance caused between U.S. users and users in Iran), and a second money judgment in the amount of $1,612,031,763 (which DOJ called the "1960 Money Judgment," representing the amount Binance collected in fees from transactions involving its U.S. users in furtherance of the conspiracy and scheme that included those IEEPA violations). *Id.* at 5.

59.     As part of the plea, DOJ agreed to credit certain amounts Binance paid or agreed to pay to three federal agencies: the Commodities Futures Trading Commission ("CFTC"), FinCEN (within the Treasury Department), and the Treasury Department's Office of Foreign Assets Control ("OFAC").

60.     All told, and following a revision by the parties to the Plea Agreement that the court accepted, Binance agreed to the following payment terms:

- No later than 30 days after sentencing, payment of $898,618,825 (the "IEEPA Money Judgment" portion of the forfeiture);

- No later than 6 months after sentencing, payment of $1,612,031,763 of the Criminal Fine, subject to crediting; and

- No later than 15 months after sentencing, payment of the remainder of the Criminal Fine and the "1960 Money Judgment" portion of the forfeiture," subject to crediting.

Notice of the Parties in Advance of Sentencing, *USA v. Binance Holdings Ltd.*, No. 2:23-cr-00178-RAJ (W.D. Wash. Dec. 11, 2023), ECF No. 28, at 5 ("Revised Plea Agreement").

61.     Sentencing was held on February 23, 2024 and the Court entered its judgment the same day. *See* Judgment, *USA v. Binance Holdings Ltd.*, No. 2:23-cr-00178-RAJ (W.D. Wash. Feb. 23, 2024), ECF No. 35 (the "Judgment"). The Judgment set forth the same payment amounts and schedule as the Amended Plea Agreement. *Id.* at 4.

62.     On May 24, 2024, DOJ filed a notice stating that Binance had paid the first payment of $898,618,825 and that this amount qualified to be deposited into the Victims Fund. *See* U.S.

Notice of Partial Satisfaction of Forfeiture Money Judgment, *USA v. Binance Holdings Ltd.*, No. 2:23-cr-00178-RAJ (W.D. Wash. May 24, 2024), ECF No. 38, at 2, (the "Partial Satisfaction Notice"); *see also* Office of Public Affairs, *Justice Department Announces Anticipated Distribution of at Least $940M to Victims of State Sponsored Terrorism in 2025*, Dep't. of Just., (June 14, 2024), https://www.justice.gov/opa/pr/justice-department-announces-anticipated-distribution-least-940m-victims-state-sponsored). That amount was deposited into the Victims Fund shortly thereafter. *See Qualifying Cases*, U.S. Victims of State Sponsored Terrorism Fund, https://www.usvsst.com/Home/QualifyingCases (last visited Sept. 23, 2024).

63.    Between July 8, 2024 and July 16, 2024, the *Binance* docket includes minute entry receipts for funds received in the total of $1,505,475,575. This amount is consistent with what was set out in the Judgment as the second payment due on or before August 23, 2024, for the Criminal Fine, less crediting.

64.    As to this second payment, DOJ stated its intentions for this part of the *Binance* Proceeds in a letter of May 3, 2024 to U.S. Senator Charles Grassley. In that letter, DOJ stated that, even though the entire case involved "an extensive scheme to operate as a U.S. financial institution while disregarding U.S. law," the amount of $1,505,475,575, representing payment for the Criminal Fine, would be directed to a different fund, not the Victims Fund. *See* Letter from Off. of Legis. Affs., Asst. Attorney General Carlos Felipe Uriarte to Sen. Charles Grassley, (May 3, 2024), available at https://www.grassley.senate.gov/imo/media/doc/doj_to_grassley_-_crime_victims_fund_follow_up.pdf. Other than the vague reference that this diversion of funds was "pursuant to statute," DOJ offered no explanation as to why it was not directing this amount— which it expressly acknowledged was derived from a "related criminal conspiracy [or] scheme" to the IEEPA violation—to be deposited into the Victims Fund, as the Victims Act required.

III.    **Related Civil and Criminal Proceedings**

65.    In parallel criminal proceedings, the DOJ also charged Zhao personally as a result of his role in the criminal conduct charged in *Binance*.  *See USA v. Zhao*, 2:23-cr-00179-RAJ (W.D. Wash. 2023). Zhao entered into a plea agreement with DOJ and agreed to pay a fine of $50,000,000, which was deemed satisfied by civil penalties Zhao paid to other United States' agencies. *See e.g.,* Plea Agreement, *USA v. Zhao*, 2:23-cr-00179-RAJ (W.D. Wash. Nov. 11, 2023), ECF No. 31. Zhao was also sentenced to four months imprisonment. *See* Sentencing, *USA v. Zhao*, 2:23-cr-00179-RAJ (W.D. Wash. Apr. 30, 2024), ECF No. 89.

66.    On March 27, 2023, the CFTC filed a civil action against Zhao, Binance, and Binance affiliates owned by Zhao which were involved in the operation of Binance.com for violating the Commodity Exchange Act and related regulations arising from the conduct at issue in the criminal action. *See CFTC v. Zhao et al*, 1:23-cv-01887 (N.D. Ill. 2023). On January 16, 2024, the parties entered into a consent order in which the defendants admitted to all facts in the *Binance* Plea Agreement and consented to monetary penalties to resolve their civil liability. *See* Amended Consent Order, *CFTC v. Zhao et al*, 1:23-cv-01887 (N.D. Ill. Jan. 16, 2024), ECF No. 83. As a result of the consent order, Zhao agreed to pay a civil monetary penalty of $150,000,000. *Id.* at 24. Binance and its affiliates agreed to a disgorgement of $1,350,000,000 to be paid within nine months and a civil monetary penalty of $1,350,000,000 to be paid within 18 months.  *Id.* at 22, 24. Binance and its affiliates were credited for any amounts forfeited or paid in the criminal proceedings against the disgorgement obligation and were credited $500,000,000 against the civil monetary penalty for amounts paid in the related proceedings.

67.    Separately from the judicial proceedings against it, but on the same day it entered into the criminal Plea Agreement, Binance reached settlement agreements with two Treasury

Department agencies—FinCEN and OFAC—to resolve its civil liability for the same conduct at issue in the criminal proceedings.

68.     Specifically, Binance agreed to pay $968,618,825 to OFAC to settle its civil liability for violations of sanctions programs, including sanctions applicable to Iran, North Korea, and Syria. *See* U.S. Treasury, *Settlement Agreement between the U.S. Department of the Treasury's Office of Foreign Assets Control and Binance Holdings, Ltd.* (Nov. 21, 2023), https://ofac.treasury.gov/system/files/2023-11/20231121_binance.pdf.  $898,618,825 of the amount that Binance agreed to pay to OFAC was deemed satisfied by the amounts it paid in the criminal proceedings (*i.e.*, the money it paid to the United States as described in paragraph 62 of this Complaint).

69.     Binance also agreed to pay a civil penalty in the amount of $3,400,000,000 to FinCEN, but $2,470,000,000 was credited against the assessed penalty based on amounts Binance agreed to pay in the criminal case as part of its plea, and $150,000,000 was suspended as a result of Binance's compliance with undertaking future measures to ensure compliance with the law. *See* In the Matter of Binance – Consent Order Imposing Civil Money Penalty, Financial Crimes Enforcement Network (Nov. 21, 2023), https://www.fincen.gov/sites/default/files/enforcement_action/2023-11-21/FinCEN_Consent _Order_2023-04_FINAL508.pdf. The FinCEN consent order specifically highlights Binance's role in terrorist financing, including of Al Qaeda, Hamas, ISIS, and the Palestinian Islamic Jihad— arms or proxies of State Sponsors of Terrorism. *Id.* at 46. The FinCEN consent order also highlights how sanctioned Iranian individuals and entities, such as ones associated with the Iranian Revolutionary Guard Corps, took advantage of Binance's lack of oversight to launder money and process illicit transactions. *Id.* at 48-49.

IV.     **100% of the Criminal Proceeds and 75% of the Civil Proceeds Binance Has Paid (Or Will Pay) to the United States Are Required to be Deposited into the Victims Fund.**

70.     The Victims Act requires that all of the criminal proceeds, and 75% of the civil proceeds, paid to the United States by Binance or Zhao (or any affiliates of either) in connection with the above-referenced conspiracy and scheme must be deposited into the Victims Fund.

71.     Pursuant to the Victims Act, "all funds" paid or forfeited to the United States as a criminal penalty or fine and 75% of all funds paid or forfeited to the United States as a civil penalty or fine shall be deposited or transferred into the Fund for distribution" if they arise from any of:

(i) a violation of any license, order, regulation, or prohibition issued under IEEPA (50 U.S.C. 1071 et seq.);

(ii) a violation of any license, order, regulation or prohibition issued under TWEA (50 U.S.C. App. 1 et seq.);

(iii) any related criminal conspiracy;

(iv) any related scheme;

(v) any related other federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

*See* 34 U.S.C. § 20144(e)(2)(A)(i)-(ii) (emphasis added).

72.     From a plain reading of the statute, all of the amounts paid to the United States by Binance and Zhao for the criminal acts to which they pled guilty must be deposited into the Victims Fund. Congress' use of "shall" leaves DOJ no discretion. *See Maine Community Health Options v. United States*, 590 U.S. 296, 310 (2020) ("The first sign that the statute imposed an obligation is its mandatory language: 'shall.'").

73.     The criminal fines and forfeitures paid by Binance arise from violations of IEEPA, a related criminal conspiracy, a related scheme, or related other federal offenses arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

74.     Similarly, the amounts paid by Zhao are the result of a related criminal conspiracy, a related scheme, or a related other Federal offense arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism.

75.     Finally, the amounts Binance paid (or will pay) to the United States to resolve its civil liability with CFTC, OFAC, and FinCEN are fines and forfeitures arising from a criminal conspiracy or scheme related to its violations of IEEPA, or from other federal offenses arising from the actions of, or doing business with or acting on behalf of, a state sponsor of terrorism. 34 U.S.C. § 20144(e)(2)(A)(ii). As civil penalties paid to the United States for these offenses, 75% of these proceeds must be deposited into the Victims Fund.

76.     There is no other reasonable way to classify the *Binance* Proceeds—criminal and civil—other than those traceable to violations of IEEPA, a related criminal conspiracy, a related scheme, or related other federal offenses arising from the actions of, or doing business with or acting on behalf of, a State Sponsor of Terrorism. *See* 34 U.S.C. § 20144(e)(2)(A)(i).

77.     No monies paid to CFTC, OFAC, or FinCEN have been deposited into the Victims Fund.

## V.     **The DOJ Has No Discretion.**

78.     The DOJ is charged with the non-discretionary task of ensuring that qualifying proceeds be directed for deposit into the Victims Fund.

79.     The Victim Fund's website publishes information about qualifying cases. That website reflects the deposit into the Victims Fund of the *Binance* IEEPA Money Judgment in the amount of $898,618,825 that Binance paid to the United States. DOJ has not, however, transferred the other criminal and civil amounts paid by Binance and Zhao, including the amounts those Defendants paid to the Western District of Washington in July 2024, to the Victims Fund. *See Qualifying Cases*, U.S. Victims of State Sponsored Terrorism Fund,

https://www.usvsst.com/Home/QualifyingCases (last visited Sept. 23, 2024). And DOJ has made clear that it does not intend to do so.

80.     There is no discretion in the Victims Act: proceeds either qualify or they do not. DOJ has no authority to decide whether to deposit qualifying proceeds based on programmatic preferences, political considerations, or any other reason. Nor does it have discretion to carve up qualifying proceeds into component parts to minimize deposits into the Victims Fund, especially where the entire case involves a coordinated conspiracy or scheme, as is true of *Binance*.

81.     DOJ correctly directed the first payment of approximately $900 million into the Victims Fund, but has not deposited the rest of the *Binance* Proceeds into the Victims Fund, even though those proceeds arise from the *same or related* conspiracy or scheme.

## VI.     Failing to Deposit the *Binance* Proceeds into the Victims Fund Will Injure Plaintiffs.

82.     Plaintiffs have each been determined by the special master to be eligible claimants to the Victims Fund. *See* 34 U.S.C. § 20144(c). Mr. Coe was determined to be eligible on July 5, 2024. Mr. Englehardt was determined to be eligible on September 20, 2022. Ms. Twine was determined to be eligible on July 11, 2024. Ms. Wade was determined to be eligible on September 20, 2022.

83.     The special master of the Victims Fund is required to authorize distributions of qualifying deposits to all eligible victims, such as Plaintiffs, as well as the nearly 20,000 other eligible victims in the Victims Fund.

84.     If the *Binance* Proceeds are not deposited into the Victims Fund as the Victims Act requires, Plaintiffs will be deprived of the benefit of their right to receive their *pro rata* shares of those proceeds they would have received had the *Binance* Proceeds been deposited into the Victims Fund and thereafter disbursed as required by law.

85.     The Victims Act requires "all" criminal funds and 75% of civil funds paid to the United States in qualifying cases to be deposited. Congress did not authorize DOJ to parse qualifying proceeds in piecemeal fashion, allowing it to put *some* proceeds in the Victims Fund while directing other proceeds for other purposes.

## COUNT I (against DOJ only)

## (Agency Action Unlawfully Withheld or Unreasonably Delayed)

86.     Paragraphs 1 – 85 are incorporated by reference.

87.     In failing to direct the deposit of 100% of all criminal proceeds and 75% of all civil proceeds already paid to the United States arising from *USA v. Binance Holdings Ltd.*, 2:23-cr-00178-RAJ (W.D. Wash. 2023), into the Victims Fund, DOJ has unlawfully withheld action it is required by law (the Victims Act) to take. *See* 5 U.S.C. § 706(1).

88.     Alternatively, DOJ's delay in directing the deposit of the *Binance* Proceeds so far paid to the United States into the Victims Fund, as the Victims Act requires, is unreasonable. *See* 5 U.S.C. § 706(1).

## COUNT II (against all Defendants)

## (Declaratory Judgment)

89.     Paragraphs 1 – 88 are incorporated by reference.

90.     The Declaratory Judgment Act, 28 U.S.C. § 2201, grants this Court authority to declare Plaintiff's legal rights where an actual controversy exists.

91.     As stated above, an actual controversy exists between Plaintiffs and Defendants within the jurisdiction of this Court.

92.     For the reasons stated above, Plaintiffs seek a declaration of their rights under the Victims Act, to wit, that 100% of all criminal proceeds and 75% of all civil proceeds paid or to be paid to the United States arising from *USA v. Binance Holdings Ltd.*, 2:23-cr-00178-RAJ (W.D.

Wash. 2023), and all related criminal or civil matters, are required to be deposited into the Victims Fund.

## PRAYER FOR RELIEF

Plaintiffs respectfully ask that the Court:

a. declare that 100% of all criminal proceeds and 75% of all civil proceeds paid or to be paid to the United States arising from *USA v. Binance Holdings Ltd.*, 2:23-cr-00178-RAJ (W.D. Wash. 2023), and all related criminal or civil matters, plus any interest accrued on such amounts, are required to be deposited into the Victims Fund;

b. order Defendants to direct the deposit of all such proceeds already paid, or to be paid, to the United States by Binance, Zhao, their agents, or any other *Binance* defendant, plus any interest accrued on such amounts, into the Victims Fund, consistent with the declaration in paragraph "a";

c. award Plaintiffs their reasonable attorneys' fees and costs expended herein; and,

d. grant such additional relief as this Court deems just and proper.

September 23, 2024                                  Respectfully submitted,


/s/ Daniel W. Wolff
Daniel Wolff (DC Bar No. 486733)
    DWolff@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004
(202) 624-2500 (phone)
(202) 628-5116 (fax)

*Attorney for Plaintiffs*